IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 21, 2025

## STATE OF TENNESSEE v. CHAISTY DAWN JONES

**Appeal from the Circuit Court for Maury County**
**No. 29042     J. Russell Parkes, Judge**

_____

**No. M2024-00446-CCA-R3-CD**

_____

In June 2021, the Maury County Grand Jury indicted Defendant, Chaisty Dawn Jones, for first degree premeditated murder in Count 1, first degree felony murder perpetration of aggravated burglary in Count 2, aggravated burglary in Count 3, employment of a firearm during the commission of a dangerous felony in Count 4, and simple possession of marijuana in Count 5. At trial, the jury convicted the Defendant of the lesser included offense of second degree murder in Count 1 and convicted her as charged in Counts 2, 3, 4, and 5. The trial court merged the conviction in Count 1 with the conviction in Count 2 and imposed an effective life sentence. On appeal, the Defendant argues that the trial court erred in instructing the jury that the Defendant had a "duty to retreat" prior to acting in self-defense. After review, we affirm the judgments of the trial court but remand for entry of corrected judgments in Count 1 and Count 2.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN W. SWORD, JJ., joined.

M. Todd Ridley, Assistant Public Defender – Appellate Division, Tennessee District Public Defenders Conference (on appeal); Travis Jones, District Public Defender; and Amanda L. Dunavant, Assistant District Public Defender (at trial), for the appellant, Chaisty Dawn Jones.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Brent Cooper, District Attorney General; and Pamela Anderson and Kyle Dodd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Prior to trial, the State filed a motion in limine, requesting the trial court to conduct a hearing pursuant to State v. Perrier, 536 S.W.3d 388 (Tenn. 2017), to determine whether self-defense should be charged and, if so, whether to also charge that the Defendant did not have a duty to retreat before acting in self-defense. The State observed that in deciding whether the Defendant did not have a duty to retreat, the trial court should consider whether the State had produced clear and convincing evidence that the Defendant was engaged in unlawful activity such that the "no duty to retreat" instruction would not apply. The State also stated that because the allegedly unlawful activity is often uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties. Id. at 403. The State argued that the Defendant was engaged in unlawful activity and, therefore, did have a duty to retreat before employing deadly force and that the jury should not be instructed otherwise. The court addressed the motion after the close of the trial evidence.

**Trial.**[1] Erick Solano, a detective with the Columbia Police Department, testified that on the night of March 9, 2021, he was working as a patrol officer and received a call about a gunshot victim at Academy Court. He was the first officer to arrive on the scene, and as soon as he exited his patrol car, several people directed him to the back of the home. Although he initially saw a person lying on the ground, the group informed him that the person shot was inside the open back door of the home. Upon entering the home through the back door, Detective Solano found a female victim, Clarissa Keiser, lying face down, unresponsive, and without a pulse in a location approximately four to five feet from the door's threshold. The victim appeared to have a single bullet wound to her chest. Detective Solano performed CPR on the victim until the paramedics arrived, but he was unable to revive the victim. The victim was declared deceased at the scene.

Michael Keiser testified that his son, Joshua Keiser, was married to the victim, and that they, along with the victim's two-year-old daughter, lived in the basement apartment at Academy Court. Michael[2] stated that while he was relaxing on the sofa in the basement living room, he heard screaming and a voice he did not recognize. He then heard something about a "twenty-year-old and selling pot" and saw the victim and Brent Menaugh, who also lived in the basement apartment, run into the house. Michael observed the victim struggling to shut the door as the arm of the Defendant, who was holding a gun, was visible. He "heard gunfire" and saw his wife, Barbara Keiser, coming in and out of the door. When he glanced outside after the shooting, he remembered seeing a woman's jean-clad legs.

---

[1] We have summarized the evidence presented at trial only as it relates to the issue the Defendant raises on appeal.

[2] For clarity, and because many of the witnesses share the same name, we will often refer to witnesses by their first names. We intend no disrespect in doing so.

On cross-examination, Michael stated that he heard two gunshots and then heard the victim say, "I've been shot," and saw her drop to the floor. He confirmed that he did not see anything that occurred between the Defendant and the victim outside and only saw the Defendant's arm and the victim's efforts to close the door.

Barbara Keiser, the victim's mother-in-law, also lived at Academy Court. On March 9, 2021, Barbara spent the day shopping with her son Joshua, the victim, and the victim's daughter, before picking up dinner and returning home between 7:15 and 7:20 p.m. When they arrived home, the victim went outside with Brent to smoke.

Barbara prepared dinner for her husband and took the trash out to the garbage bins. While outside, Barbara saw a woman she had never seen before, later identified as the Defendant, talking with Brent while the victim stood nearby. Although she could not hear what Brent was saying, she remembered the Defendant angrily stating, "I can f[--]k you up, and I can f[--]k up this whole house because I can." Barbara became alarmed and motioned for the victim to come inside the house. Barbara was unable to hear Brent's response to the Defendant, but she could tell that Brent was verbally defensive. At the time, Barbara just wanted to get the victim safely inside the house and to call the police, but the victim continued to stand beside Brent and the Defendant. Barbara went inside the home and called the police.

Barbara identified photographs taken from the home's surveillance video, stating that they fairly and accurately represented her home, and these photographs were entered into evidence and shown to the jury. Barbara said one of the photographs showed that at 8:01:31 p.m., she heard noises outside and saw Brent, with the victim directly behind him, heading toward the open back door. Another photograph at 8:01:32 p.m. depicted Brent walking into the home, the victim just inside the home by the doorway, and the Defendant under a bright light outside the door. Barbara said that after the victim came into the home, she was leaning over, trying to shut the door, and screaming that the Defendant had a gun. A photograph taken at 8:01:32 p.m. showed the victim leaning toward the door and the Defendant pushing at the door. Barbara stated that a photograph taken at 8:01:41 p.m. depicted the victim at the door; the Defendant's hand, which was holding a gun, going around the door as it was being closed; and Barbara's hands on her head in disbelief. Barbara explained that this photograph was taken just after the Defendant came into the house, pointed the gun at the victim, and shot the victim.

Barbara next identified the surveillance video clips with audio that were taken by an inside camera pointed at the back door to the basement. These clips were admitted and played for the jury. Barbara stated that when she had reviewed these video clips the previous day, she could hear Brent telling the Defendant, "You need to leave." She also

heard the victim tell the Defendant, "Get the f[--]k out." In response, the Defendant yelled and refused to leave. Barbara confirmed that there was nothing that precluded the Defendant from leaving and that there was no one holding or restraining the Defendant at that time.

After the victim was shot, Barbara stepped over the victim to go outside to call the police, and she noticed that the Defendant was lying on her back on the ground but still had the gun in her right hand. She said people were beating the Defendant and trying to wrestle the gun out of the Defendant's hand, but the Defendant refused to release it. Barbara confirmed that a short period after the victim was shot, she heard a third gunshot.

On cross-examination, Barbara acknowledged that this incident unfolded very quickly. When asked whether she told Detective Landon Barber that the Defendant did not come into the house, Barbara denied this, stating, "I said [the Defendant] didn't enter fully into the house. She entered the doorway."

Ian Keiser, the Keisers' son, testified that he lived at Academy Court when the shooting occurred. He confirmed that there were no obstructions that would have prevented someone from walking from the Keisers' backyard down the driveway and to the street. On March 9, 2021, Ian stated that he got home from work around 5:00 p.m. and began watching television upstairs with his girlfriend. He noticed around 6:00 or 6:30 p.m. that a silver truck he did not recognize was parked in front of the house. Later that night, Ian saw Brent standing outside with the Defendant, although Ian did not know the Defendant at that time. Around 7:15 p.m., Ian heard yelling outside, raised a window, and observed Brent arguing with the Defendant. He then saw the victim come outside, talk to the Defendant, and tell her to leave, although the Defendant refused to leave. Ian eventually stepped out of the upstairs window and onto the roof, where he could see the area from the driveway to the home's back door. He confirmed that if someone were standing at the basement door, he would not be able to see that person.

While he was on the roof, Ian observed the victim verbally arguing with the Defendant and telling the Defendant to leave, although she refused to leave the property. The victim and the Defendant then got into a physical altercation. Ian described this physical altercation, stating, "[There was a] little bit of hair pulling, fist fighting, and they got to the ground." He said the victim got up and walked toward the basement door, and then the Defendant "got up, pulled out her firearm, and started running towards the door." Ian heard the victim say, "Oh, she has a gun," and then the victim ran toward the basement door. The Defendant got up from the ground, and Ian saw the Defendant grab her gun with her right hand and sprint toward the basement door. When Ian saw the Defendant pull out her gun, the victim was already behind the basement door. He then observed "a struggle at the door," with the Defendant "being pushed back and forth through the door."

- 4 -

At the time of this incident, Ian said no one was prohibiting the Defendant from leaving the property. He also said that if the Defendant had chosen to leave the property on foot, she had five or six different ways to exit the property.

Ian immediately got off the roof and told his girlfriend to call the police. He was running down the stairs when he heard a single gunshot. When he got outside, Ian could see that the Defendant had been tackled by his brothers, Winston and Tommy Keiser, and by his neighbor, Desirae Freeman, and all of these individuals were struggling to get the Defendant's gun away from her. Desirae was using a broom to help pry the gun from the Defendant's hands. Ian approached the group and was eventually able to take the gun from the Defendant. He checked on the victim and attempted to perform CPR on her, but she did not respond. When the Defendant tried to escape, he and the rest of the group held the Defendant down until the police arrived.

Ian said that in addition to the Defendant having a gun, Brent had a gun. As Ian and the rest of the group were trying to wrestle the gun from the Defendant, Ian heard Brent fire the third shot. At the time, Brent was standing by the fence wall where the outdoor camera was installed and was not helping them disarm the Defendant. Ian was unsure where Brent aimed the shot. However, when he and the other individuals who were trying to disarm the Defendant heard this third shot, it scared them because they initially thought the gunshot had been fired from the Defendant's gun. Ian described the Defendant's actions that night as "idiocy" and "unnecessary" and asserted, "There's multiple ways not to do what she did, and she did it anyway."

On cross-examination, Ian said the Defendant attempted to flee the crime scene after they disarmed her. He and others held the Defendant down until the police arrived.

Joshua Keiser, the victim's husband, testified that in 2021, he was living in the bottom floor of his parents' home with the victim and the victim's daughter, Venus. He noted that Brent was also living with them. On March 9, 2021, Joshua, along with his mother, his brother Winston, the victim, and Venus went out shopping, picked up dinner, and arrived back home between 7:00 and 7:30 p.m.

Joshua acknowledged that in March 2021, Brent earned money by selling marijuana. He said Brent conducted his drug deals "just right outside of the house" or "sometimes in the back of the house."

When they returned home from shopping, Joshua said Brent and the victim went outside to smoke, and approximately ten to fifteen minutes later, Joshua "heard yelling outside from a voice [he] didn't recognize." Joshua went to investigate, and when he got

outside, he saw the victim and the Defendant fighting and saw them then fall to the ground. Joshua asserted that he had never seen the Defendant prior to that night and had never heard of her.

At the time, Joshua stood to the right side of the basement door, his brother Winston was on the left side of him, and Brent was on the left of Winston. When Joshua first stepped out, he did not see Brent with a gun in his hand. Joshua said the victim got up and started backing away. Then the Defendant, who was a couple of feet away from the victim, stood up and pulled a gun from her waistband. He said that everyone began screaming that the Defendant had a gun, and the victim and Brent ran through the basement door while Joshua and the others "froze." Joshua did not see a gun in Brent's hand as he ran toward the basement door. The Defendant "head[ed] toward[] them" and "motioned the gun" in the direction of Joshua and Winston to stop them "from interfering[.]" He said the Defendant ran toward the door while swinging the gun around. Joshua stated that the Defendant ran up; slammed against the door to keep it open; and put her hand, which was holding a gun, around the door as the victim attempted to close the door; he then heard a gunshot. He explained that the Defendant "stop[ped] the door from closing fully." As the Defendant pushed with her left arm, she "put her right arm with the gun inside the house around the door[,]" which opened to the inside of the home. He stated that the "entire right side" of the Defendant's body crossed the threshold of the home as the door swung open "a foot or two at least." Joshua said that while the Defendant "had her arm inside the door with the gun," he heard a single gunshot. However, after reviewing the surveillance video, he now knew that the Defendant fired two shots in quick succession.

At the time, Joshua said he had no way of knowing that his wife had been shot, although he knew the bullet had gone into his home. He said that the Defendant "immediately backed up" and "tr[ied] to run away after firing these shots." Joshua said he and the others outside immediately pinned the Defendant's right arm, which was holding the gun, to the ground to ensure that no one got hurt, and they tried to get the gun out of the Defendant's hand as they waited for the police to arrive. Joshua said that after the Defendant fired the shots, she was "[a]ggressive," "yelling," and never laid down her gun or put up her hands. He said they were trying to remove the gun from the Defendant's hand because they were afraid she would "shoot somebody else." As they were trying to disarm the Defendant, Joshua and Winston heard another gunshot, and they thought it came from the Defendant's gun. After they finally got the Defendant disarmed, Joshua ran inside and realized that the victim had been fatally shot.

Joshua said he informed the police about a camera inside the home and a camera outside the home. He acknowledged that although the inside camera footage was collected, the outside camera footage for that day was "erased." He recalled Brent telling him he was

- 6 -

afraid that the camera caught him selling marijuana and did not want to get caught. Joshua said that Brent knew all of his passwords and had access to both his phone and the camera.

On cross-examination, Joshua acknowledged that after the first two shots were fired and the Defendant was on the ground, Desirae Freeman came over, and his brother Tommy was outside with them.

Elizabeth Freeman testified that she lived next door to the Keisers with her two teenage children, Desirae and Anthony. She said that on March 9, 2021, she worked from home until 6:30 p.m. and then took Desirae and two of her friends to get something to eat. Before leaving, she observed a truck parked in front of her home, slightly blocking the street. She saw a woman sitting in the driver's seat of the truck with the door open, texting on her cell phone. Elizabeth did not recognize the woman at the time but identified her at trial as the Defendant.

When they returned home approximately an hour later, Elizabeth noticed that the truck was still in the same spot, and the Defendant was still sitting in the driver's seat with the door open. Elizabeth went inside her home and asked Desirae to call the Keisers so they could get the driver to move her truck. As Desirae picked up her phone, Elizabeth and the people with her heard gunshots. Desirae and her friends ran toward the Keiser residence while Elizabeth called 9-1-1. As she was on the phone with the 9-1-1 dispatcher, Elizabeth walked over to the Keisers' home and heard voices yelling, "I'm going to kill you," "She's got a gun," "Give me the gun," "Drop the gun," "I've got the gun," "You killed her," and "She's a mother. Why did you kill her?" When she arrived at the Keisers' residence, she saw the Defendant with what appeared to be marijuana in her hand lying in a fetal position on the ground. Elizabeth entered the Keisers' home and saw the victim's unresponsive body on the floor.

Elizabeth instructed Desirae to look for Venus, the victim's child. She said Desirae found Venus, put her under a blanket, and handed her to Elizabeth, who took the child to safety.

Desirae Freeman testified that she saw the woman sitting in a silver truck that was slightly blocking the street both before and after they returned from getting something to eat. When they returned home, she heard "bickering" from people next door that got progressively louder. She did not recognize the voices that were arguing and could not hear the words being said. An instant later, Desirae heard two or three gunshots. She specifically remembered hearing a woman's voice arguing, but that it was not the victim's. After hearing the gunshots, Desirae went toward the Keisers' property, which was not separated by a fence or any other barrier. When she arrived at the Keisers' backyard, she saw Winston, Tommy, and Brent outside trying to disarm the Defendant, whom she had

- 7 -

never seen prior to that night. She also saw the unresponsive victim lying on the floor of the basement with Joshua and Barbara nearby. Desirae grabbed a broom and joined the people attempting to take the gun from the Defendant. She struck the Defendant in the head and tried to choke her with the broom, and Winston, Tommy, and Brent kicked the Defendant in the stomach to get her to loosen her grip on the gun. During this struggle, the Defendant repeatedly threatened to shoot them and refused to release the gun until she heard the police sirens. Desirae later got Venus from inside the apartment and put a blanket over her head so she would not see her deceased mother.

On cross-examination, Desirae said she never saw Brent with his own gun. She stated that Brent shot the Defendant's gun in the air to make sure it was empty. Desirae learned after this incident that this "wasn't the first time [the Defendant] had gotten weed [sic] from Brent Menaugh."

Daniel Willis, an investigator with the Columbia Police Department, testified that he responded to the shooting call at Academy Court on March 9, 2021. When he arrived at the scene, he observed the emergency medical personnel rendering aid to the Defendant, who had suffered trauma to her head. He also observed the deceased victim lying inside the doorway of the basement. Investigator Willis found a live round of ammunition outside the basement door and saw medical personnel locate a small bag of what appeared to be marijuana on the Defendant's person while providing aid. This substance was later confirmed through TBI testing to be 2.7 grams of marijuana. Investigator Willis stated that when the emergency medical personnel moved the Defendant, he found a spent shell casing and a second live round of ammunition that had been underneath the Defendant.

Caleb Rubert, a patrol officer with the Columbia Police Department, testified that he retrieved a gun from the roof of a black Dodge Charger parked in the Keiser's driveway. The gun was later identified as a tan Taurus 9mm pistol.

Marsela Davis, a school resource officer with the Maury County Sheriff's Department assigned to Whitthorne Middle School, testified that on March 9, 2021, she wrote a petition on J.P., an eleven-year-old in sixth grade, for simple possession of marijuana during school hours in violation of Code section 39-17-418. She stated that she read and provided a copy of this petition to Chaisty Jones, the Defendant, who was the guardian of J.P. Deputy Davis noted that when she called the Defendant to the school to take J.P. home, the Defendant was "angry" with "the administration[,]" "visibly upset because of the type of charge [J.P.] was charged with[,]" and believed the "other students involved . . . w[ere] the reason for the charge." Deputy Davis noted that the marijuana, which she seized, was found in J.P.'s locker. Deputy Davis asserted that this was not the first petition nor the last petition she sought against J.P., who was no longer a student at Whitthorne Middle School.

Landen Barber, a detective with the Columbia Police Department, testified that he was the lead investigator on this case. He stated that two live 9mm rounds of ammunition were found a few feet from the basement doorway. One spent 9mm casing was found outside, approximately twenty-four feet from the basement doorway. Another spent 9mm shell casing was found inside the basement apartment, two feet and ten inches from the basement doorway. One piece of a projectile fired from a firearm was found on the bottom threshold of the basement doorway. In addition, a projectile was found in the basement drywall, on the same wall where the indoor camera was installed. Detective Barber stated that the Taurus 9mm handgun, which contained eight live rounds, was collected from the scene. He noted that a Hi-Point 9mm handgun was found in a safe inside the basement apartment, and the surveillance video showed Brent holding this gun when he went to the kitchen area.

Detective Barber conducted the data extraction on the Defendant's cell phone, which produced telephone call logs and text messages from March 9, 2021. The data extraction showed that the Defendant received a call from the Whitthorne Middle School at 11:55 a.m. It also showed that at 7:33 p.m., the Defendant read texts from J.P.'s iCloud email address to her that included the address "Academy Court" and told her to "Come to the back driveway." Moreover, the Defendant placed a seven-second FaceTime call, likely unanswered, at 7:55 p.m. to J.P.'s iCloud address. Also, at 7:55 p.m., the Defendant sent J.P. a text message stating, "Tell him I'm here now." Furthermore, the Defendant received a FaceTime call from J.P.'s iCloud address at 7:56 p.m. that lasted twenty-one seconds. Detective Barber observed that the first 9-1-1 call that was placed regarding this incident occurred around 8:00 p.m. on March 9, 2021.

Detective Barber identified and described the images from the Keisers' indoor surveillance camera, which depicted the victim at the door and the Defendant's arm crossing the door's threshold. He stated that one of these images showed the victim "pushing at the [basement] door, trying to get it shut[,]" and another person standing just inside the basement apartment. Another image showed the door opened halfway with the victim on the inside and the Defendant between the door and the door frame on the inside of the basement apartment. Still another showed the victim slumped down and the Defendant's arm holding an object. Additional images depicted a bullet hole in the center of the front of the victim's shirt and a bullet hole in the back of the victim's shirt, indicating entrance and exit wounds.

On cross-examination, Detective Barber acknowledged that Brent was never asked about firing his Hi-Point 9mm gun, about the drug paraphernalia found in the house, or whether he deleted the outdoor surveillance footage. He explained that all that evidence was uncovered after Brent's initial interview with police. Although Detective Barber

attempted to interview Brent while he was in a rehabilitation facility in Nashville, he was unable to do so.

On redirect examination, Detective Barber said he had no evidence that Brent Menaugh shot the victim.

Alex Brodajg, a special agent forensic scientist with the TBI and an expert in firearms examination, testified that the Taurus 9mm handgun found at the crime scene was functioning normally. He also examined the Hi-Point 9mm handgun and determined it was functioning normally. Special Agent Brodajg determined that the two cartridge cases found at the scene had been fired from the Taurus handgun, and one of the cartridges had been fired from the Hi-Point weapon. He also stated that the projectile collected from the scene could not be excluded as having been fired from the Taurus 9mm handgun but could be excluded as having been fired from the Hi-Point 9mm.

Emily Denison, a forensic pathologist in the Nashville Medical Examiner's Office, was accepted as an expert in the field of anatomic and forensic pathology. She opined that the victim's cause of death was a gunshot wound to the chest and the manner of death was homicide.

The defense presented testimony from Samantha Wark, Brent Menaugh, and the Defendant. Samantha Wark, an emergency medical services worker with Maury Regional Hospital, testified that she responded to the scene on March 9, 2021. She stated that the Defendant "had edema and bleeding around the right eye and forehead" and had a "sunk in deformity to her right temple[,]" which meant that when Wark touched it, it pressed "inward." The Defendant also had an "abrasion to her right knee." She stated that because of the Defendant's head injury, she was air-lifted to the trauma center at Vanderbilt.

Brent Menaugh testified that the Defendant confronted him at the Keisers' home and accused him of selling marijuana to her son, although he denied this conduct. He said Barbara poked her head outside and asked who the Defendant was, and he, the victim, and Tommy said that they were trying to get the Defendant to leave, but she would not leave. Barbara replied that she was calling the police, and Brent and the group encouraged the Defendant to leave the property. Brent said he did not recall who started the physical altercation between the Defendant and the victim, but after they fought for ten to fifteen seconds, the victim let the Defendant go. Brent admitted he was in possession of his Hi-Point 9mm handgun that night. He stated that the Defendant began reaching under her shirt for what they assumed was a weapon, and he and the victim ran inside. Brent said that he went to the bedroom to check on Venus and then came back into the living area. He did not realize that gunshots had been fired until the victim stated, "She just shot me" and then fell to the ground.

- 10 -

Brent stepped over the victim to go outside but could not recall whether he had his gun in his hand at the time. He saw several individuals trying to get the gun out of the Defendant's hand but did not remember how they were trying to disarm her. Brent could not recall whether he had given the Defendant marijuana that night. He said someone eventually disarmed the Defendant, and he put her gun down somewhere. Brent acknowledged that the outdoor camera would have shown what happened outside but asserted that he did not know who deleted the outdoor camera footage. He also denied getting rid of any marijuana after the incident before law enforcement searched the property.

On cross-examination, Brent acknowledged that someone claiming to be J.P.'s cousin messaged him via Snapchat to buy marijuana, but he did not know who J.P. was or who this person was. Later, the Defendant walked up to him on the Keisers' property, but he did not know the Defendant was the person who had messaged him earlier. When the Defendant approached Brent, she said, "Hey, let me get an eighth," and as she reached the bottom of the stairs outside, she stated, "Do you know who I am?" Brent replied that he did not know who she was, and the Defendant began claiming that Brent had come to her house that morning in a white van and had sold her eleven-year-old son marijuana. He denied giving the Defendant any marijuana and claimed she did not give him any money for drugs. He also denied ever going to the Defendant's home that day and asserted that his only vehicle was a green Tracker that did not run. At that point, he and Barbara told the Defendant to leave, and the victim told the Defendant to leave more than once. Brent said that when the Defendant began reaching for a weapon, she stated, "I'm gonna [sic] kill all y'all" or "I'm gonna [sic] kill everybody out here." During his police interview, Brent recalled stating that the Defendant was aggressive the whole time during the incident.

On redirect examination, Brent admitted stating during his police interview that the victim was strong, that she could fight, and that she got the Defendant on the ground.

The Defendant, Chaisty Jones, testified on her own behalf. She said that the morning of March 9, 2021, she received a phone call advising her that her eleven-year-old son, J.P., had been caught with marijuana at school. She said J.P. later told her that he got the marijuana from Brent Menaugh.

The Defendant, posing as "[J.P.]'s cousin," then used J.P.'s cell phone to text Brent, and Brent agreed to meet her. J.P. later gave the Defendant the Academy Court address. The Defendant denied bringing a gun with her. When she arrived at the address, she saw two men outside. After the Defendant sat in her truck and checked her surroundings for approximately twenty minutes, J.P. called her and told her to "please be careful" because they were "really dangerous people." At that point, the Defendant looked through her

vehicle and found a gun that belonged to her fiancé. She said that it was not a gun she had ever used. She picked up the gun, made sure the safety was on because her fiancé had taught her to do that, and put the gun in her waistband. The Defendant said she did not check to see if this gun was loaded and did not put any ammunition in the gun before sticking the gun in her waistband.

The Defendant exited her truck and began walking down toward the area where she had seen the two men standing outside on a concrete patio. As she approached the patio area, she saw a man who was later identified as Brent Menaugh as well as a black male and a female outside. The Defendant acknowledged she was upset at the time, and when she approached the individuals outside, she said "Hey, I'm the one that messaged earlier. I'm here to get my sack." The Defendant said Brent reached into his backpack and handed her a sack of marijuana. She then told Brent she was not J.P.'s cousin but J.P's mother, that she did not want his marijuana, and that she wanted him to stop selling marijuana to her eleven-year-old son. The Defendant said Brent refused to take the marijuana back, and when the Defendant dropped the bag of marijuana, Brent demanded payment. When she refused, Brent told her that there was a camera right there, and the Defendant said she was glad because the whole thing would be on record for the police. The Defendant said Brent had a gun and started walking around her, and she asked him to move away from her. She claimed Brent then said to her, "B[---]h, I'll sell to whoever I want to, including your son, and there's nothing you can do about it."

The Defendant claimed that as she turned away, the victim struck her in the face with a metal pole. She said she hit the ground, and the victim continued to beat her until the Defendant stopped moving. The victim then told her, "B[---]h, I'm gonna [sic] blow your brains out." At the time, the Defendant was on the ground and could not see because her face was covered with blood. The Defendant stood up, got out her handgun, and followed the sound of the victim's footsteps to the house. Until she reviewed the surveillance video, the Defendant could not recall going to the basement door and firing her gun. Other than getting her gun out, the Defendant claimed she could not remember anything after the victim told her she was going to blow her brains out. Specifically, she could not recall how the safety of her gun was off and could not remember firing her gun.

The Defendant said that after firing her gun, she was dragged backward. She explained that the beating she received that night left her with "a severe traumatic brain injury" and a fractured skull. The Defendant asserted that she did not contact police about the sale of marijuana to her son because she had already called the tip line and nothing had been done. She never thought something like this would happen and believed she would be able to go to the address and tell Brent to leave her son alone. She claimed that she did not leave the area because Brent had brandished a gun. The Defendant asserted that she was "beaten to death," and there was nothing else she could do. She said she only pulled

- 12 -

out her gun because the victim threatened to kill her. She insisted that if she thought she could have left the area, she would have done so. The Defendant said she first realized the victim was dead during her police interview.

On cross-examination, the Defendant admitted she could have made a report to the police about an adult selling drugs to her son. She admitted that in August 2007, she was convicted of possession of cocaine and placed on probation. She stated that her probation was ultimately revoked.

The Defendant stated that a few days prior to the incident in this case, she saw a grey-colored vehicle in the driveway at her home, and a few minutes later, she caught her son with marijuana. She stated that she could not see the person driving the grey-colored vehicle because the windows were dark and that she was unable to write down the tag number for this vehicle. The Defendant later went through her son's phone and saw a message stating, "I'm on my way" and "Outside." Later that day, she saw that this message had been sent from Brent Menaugh. The Defendant admitted that her response to the message from Brent was to take her son's phone, pretend to be someone else, and set up a drug deal with Brent. The Defendant admitted she lied about who she was and why she was at Brent's home. She also admitted that after her son told her to be careful because these people were really dangerous, she chose to look for "protection" and to get out of the truck rather than driving away. The Defendant further conceded that she instructed her son to be involved in the plan to confront Brent Menaugh, his drug dealer, who knew her son's name, face, and address; however, the Defendant claimed she "never dreamed" she would be put in a position where she had to "defend" herself. She agreed that she had a concealed gun at the time she went to talk to the men standing on the concrete patio.

The Defendant denied that anyone told her to leave during the incident. She also denied tucking the bag of marijuana into her bra; instead, she claimed she tried to hand the "sack" of marijuana back to Brent, and when he refused to take it, she dropped it on the ground. She claimed that if the marijuana ended up in her possession, it "wasn't by [her] own hand[.]" The Defendant admitted that the paramedics removed the bag of marijuana from her person, but she claimed she was unconscious. She denied placing the marijuana "in her bra or anywhere else[.]"

The Defendant said she did not recall failing to tell the detectives during her interview that Brent Menaugh possessed a gun. She also denied telling Detective Barber, "I took the [marijuana] and didn't give him no [sic] money." The Defendant did not remember telling Detective Barber during her interview that she was standing at the basement door when she fired her gun. She claimed that at the time of her interview, she had suffered a traumatic brain injury and was under the influence of narcotics. The Defendant asserted that she was in "fight-or-flight mode" at the time of the incident. She

admitted that she did not flee the situation but claimed that she was unable to flee because there were people with weapons outside. The Defendant admitted that when she shot the victim, the victim and Brent Menaugh were inside the basement apartment and that she never identified anyone else outside having a weapon. Although the Defendant said she was worried about the victim getting a gun, she admitted that she followed the sound of the victim's footsteps as the victim was heading away from her.

The Defendant insisted that she did not remember taking the safety off of her gun, pulling the trigger, or sticking her hand, with the gun, around the door as the victim attempted to close it. She acknowledged that her hand made it into the basement apartment and that she chose to raise her right hand, which held her gun. The Defendant admitted she was at the basement door holding the gun when she fired the shot and the victim dropped to the ground.

The State presented rebuttal proof from Detective Landen Barber, who testified that he interviewed the Defendant on March 11, 2021. He said the Defendant had been brought from the Vanderbilt Hospital to the police department, where she was informed of her Miranda rights and agreed to speak with him. He noted that the Defendant's interview took place at 4:30 or 4:45 p.m. on March 11, 2021, and the last medication that the Defendant had taken was at 9:00 a.m. that morning. Detective Barber said the Defendant discussed the drug deal she set up with Brent, disclosing that when she got the marijuana, she did not give him any money and then confronted him about selling marijuana to her son. He stated that the Defendant also said she and Brent got into an argument, which led to her physical altercation with the victim. The Defendant claimed that when she was knocked to the ground, she pulled the gun out of her waistband and heard the victim say she was going to get her gun. At that point during the interview, Detective Barber said the Defendant claimed she did not remember things and began providing inconsistent statements. However, he said the Defendant admitted she went after the victim when the victim retreated into the house. The Defendant also admitted she pushed on the basement door. Detective Barber asserted that the Defendant admitted she pointed the gun in the victim's direction and fired the gun, which killed the victim.

Detective Barber noted that during the interview, the Defendant never mentioned that Brent was circling her while holding a gun, and the Defendant never mentioned the victim using a metal rod to strike her. He also said that the Defendant never disclosed that she had a bloody face and was unable to see when she followed the victim toward the house. He noted that the Defendant never said anyone prevented her from leaving the property.

On cross-examination, several photographs depicting the Defendant's injuries at the time of the interview and at the Vanderbilt Medical Center were admitted into evidence

- 14 -

and published to the jury. These photographs showed extensive bruising around the Defendant's right eye, lacerations above her right eye, lacerations to the top of both hands, bleeding around her right ear and the right side of her head, and lacerations and bruises to both knees.

Following the close of proof at trial, the trial court conducted a Perrier hearing on the self-defense instruction. The trial court determined that "the issue of self[-]defense ha[d] been fairly raised" because after considering the evidence "in the light most favorable to the [D]efendant," the [D]efendant "may have reasonably feared imminent death or serious bodily injury to justify her use of deadly force." The trial court also determined that the Defendant had a "duty to retreat." When defense counsel asked the trial court to specify the unlawful activity for the record, the trial court replied that "[the Defendant] was there for drugs and continued to be at a place where she did not have a legal right to be" which constituted "trespassing." As a result, the trial court modified the self-defense jury instruction to affirmatively state that the Defendant had a "duty to retreat" before she used deadly force against the victim.

At the conclusion of trial, the jury convicted the Defendant of the lesser included offense of second degree murder in Count 1. The jury also convicted the Defendant as charged in the remaining counts of first degree felony murder in Count 2, aggravated burglary in Count 3, employment of a firearm during the commission of a dangerous felony in Count 4, and simple possession of marijuana in Count 5. The trial court merged Count 1 with Count 2 and imposed an effective sentence of life imprisonment.

The Defendant timely filed a motion for new trial, arguing that the trial court erred in finding that the Defendant was engaged in unlawful activity under Perrier and erred in including language in the self-defense instruction that the Defendant had a "duty to retreat." The trial court denied the motion for new trial. Thereafter, the Defendant timely filed a notice of appeal.

## ANALYSIS

The Defendant argues, pursuant to State v. Perrier, 536 S.W.3d 388 (Tenn. 2017), that the trial court erred in instructing the jury that she had a "duty to retreat" prior to acting in self-defense. While acknowledging that the trial court properly found that she had the right to act in self-defense, the Defendant claims the trial court erred in concluding that she had a "duty to retreat" prior to defending herself because she was engaged in illegal activity at the time of the shooting. She asserts that because the trial court's instructional error improperly limited the jury's consideration of her self-defense claim, reversal of her convictions is required. The State counters that the trial court properly instructed the jury

that the Defendant had a "duty to retreat" before acting in self-defense. We agree with the State.

"Because questions involving the propriety of jury instructions are mixed questions of law and fact, our standard of review is de novo with no presumption of correctness. State v. Cole-Pugh, 588 S.W.3d 254, 259-60 (Tenn. 2019). We review "'the charge as a whole in determining whether prejudicial error has been committed.'" State v. Hollis, 342 S.W.3d 43, 50 (Tenn. Crim. App. 2011) (quoting In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987)). An instruction is "'prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" Perrier, 536 S.W.3d at 403 (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)). "The failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." Faulkner, 154 S.W.3d at 60 (citing State v. Ducker, 27 S.W.3d 889, 899 (Tenn. 2000)).

A criminal defendant has "'a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.'" Cole-Pugh, 588 S.W.3d at 260 (quoting Cauthern v. State, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020) (citing State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013)). "This obligation extends to general defenses, such as self-defense, defense of another, or defense of a habitation." Hawkins, 406 S.W.3d at 129 (footnote omitted). "'[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). A jury charge "'should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury.'" State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (quoting Troup v. Fischer Steel Corp., 236 S.W.3d 143, 149 (Tenn. 2007)).

A trial court need not submit "[t]he issue of the existence of a defense . . . to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c); Benson, 600 S.W.3d at 903; Hawkins, 406 S.W.3d at 129. However, "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Tenn. Code Ann. § 39-11-203, Sentencing Comm'n Cmts. The Tennessee Supreme Court held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." Hawkins, 406 S.W.3d at 129; Perrier, 536 S.W.3d at 403.

"When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129). When admissible evidence fairly raises a general defense, the trial court must submit the general defense to the jury, and at that point the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. Hawkins, 406 S.W.3d at 129; Perrier, 536 S.W.3d at 403. If a defense instruction is submitted to the jury, "the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted." Tenn. Code Ann. § 39-11-203(d).

Self-defense is a complete defense to an offense. Id. § 39-11-601; State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). At the time of the offenses in this case, Tennessee Code Annotated section 39-11-611(b), which outlines self-defense, provided the following:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2020).

In Perrier, 536 S.W.3d at 401, the Tennessee Supreme Court held that "a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be." It also clarified that a defendant's "unlawful activity" or presence in a

place where he does not have the right to be, applies only to a defendant's "duty to retreat," not to whether the defendant is entitled to threaten or use force in self-defense. Id. at 399. The Perrier court explained that "the trial court makes the threshold determination whether to charge the jury with self-defense" and that "the trial court, as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat." Id. at 403. To determine whether self-defense has been fairly raised by the proof, the trial court "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." Id. However, to determine whether to instruct the jury that the defendant did not have a duty to retreat, "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." Id. The Perrier court recognized that "[b]ecause the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties." Id. After determining that Perrier's possession of a firearm as a convicted felon amounted to "engaging in unlawful activity," the court held that Perrier had a duty to retreat under the self-defense statute before threatening or using force. Id. at 404. The court emphasized that a duty to retreat does not mean that an individual cannot defend himself, recognizing that "[a] defendant may still defend himself even to the point of using deadly force, and as Code section 39-17-1322 makes clear, may be acquitted of a weapons offense if a jury finds that his self-defense was justifiable." Id.

Following the issuance of the Perrier opinion, the Tennessee Pattern Jury Instruction for self-defense was modified in an effort to comply with Perrier. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06(b) (25th ed. 2021). Pursuant to this pattern instruction, if the trial court determines that a defendant, for offenses committed prior to July 1, 2021, was not engaged in "unlawful activity," then the court must omit the portion of the instruction that states, "The defendant would also have no duty to retreat before [threatening][using] force." Id.

Perrier did not specifically address whether the "unlawful activity" by the defendant had to have a causal nexus to the defendant's perceived need to defend himself. However, in State v. Booker, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *27 (Tenn. Crim. App. Apr. 8, 2020), rev'd on other grounds by State v. Booker, 656 S.W.3d 49 (Tenn. 2022), this court concluded that there must be "a causal nexus between the [d]efendant's unlawful activity and his need to engage in self-defense."

We reiterate that even if the trial court determines that a defendant was engaged in "unlawful activity," the trial court must still instruct the jury on self-defense so long as it is fairly raised by the evidence. Perrier, 536 S.W.3d at 399. This is because engaging in "unlawful activity" triggers a defendant's duty to retreat but does not affect a defendant's

- 18 -

right to threaten or to use force in self-defense.  Id.; State v. Chambers, No. M2019-00694-CCA-R3-CD, 2020 WL 1493940, at *16 (Tenn. Crim. App. Mar. 26, 2020).

At the jury-out Perrier hearing following the close of all proof at trial, defense counsel argued that the issue of self-defense had been properly raised and requested a self-defense instruction.  The State conceded that the self-defense instruction was appropriate.  The trial court found, upon reviewing State v. Benson, that "the issue of self[-]defense ha[d] been fairly raised" because when considering the evidence "in the light most favorable to the [D]efendant," the [D]efendant "may have reasonably feared imminent death or serious bodily injury to justify her use of deadly force."

When the trial court asked the parties about the duty to retreat portion of the instruction, the State asserted that the Defendant did have a duty to retreat because she was involved in "illegal conduct or illegal activity."  It argued that the Defendant had come onto the Keisers' property "under false pretenses" to allegedly purchase drugs.  It also asserted that the Defendant "did take the drugs and keep the drugs," which would constitute "the illegal possession of the marijuana."  Moreover, the State maintained that "[e]ven if [the Defendant] theoretically could have come on the property," the Defendant "was told repeatedly to leave and [to] exit the property."  The State additionally asserted that the Defendant pursued the victim after the physical altercation had ended, stating:

> [A]s it relates to the actual shooting, the physical altercation ha[d] . . . ended.  That's based on the testimony of the witnesses, on the video proof, and even under the defendant's own statements.  She is not being touched by anyone, and she is following the victims into their own home.
>
> [The Defendant] admits she crosses over . . . the threshold of the home with a weapon.  At that point she's actually committing the offense of aggravated burglary at the time she raises the gun and fires.  She is clearly involved in illegal conduct, and she is clearly in a place that she does not have a right to be:  inside the home when the homeowners are physically trying to prevent her from being there.  That's the position where she is when the shooting occurs.

The State argued that under the analysis in Perrier, the Defendant "does not get the benefit of the no duty to retreat [language], so that should be stricken from the normal self-defense charge."  Defense counsel countered that the jury instruction should state that the Defendant did not have a duty to retreat.

- 19 -

The trial court then stated its findings regarding the duty to retreat:

I find that the proof in this case demonstrates that the defendant . . . had submitted text messages through her son to set up a drug transaction. The defendant was later found to have in her possession marijuana.

Believing [the Defendant's] testimony, she went over there to facilitate the [drug] transaction and took the marijuana and then said, ["]I'm not going to pay.["] Additionally, the proof through the State's witnesses further dictate that [the Defendant] was engaged in unlawful activity and that she was not in a place where she had a legal right to be. Although she may have been invited initially to that home for purposes of a drug transaction, she clearly was instructed to leave by individuals who had an interest in that dwelling.

Ultimately, the trial court held that "this [D]efendant did not have a legal right to be there" and "at the time she was engaged in illegal activity." Consequently, the trial court held that the Defendant did have a "duty to retreat." When defense counsel asked the trial court to specify the unlawful activity for the record, the trial court replied that "[the Defendant] was there for drugs and continued to be at a place where she did not have a legal right to be[,]" which constituted "trespassing." It noted that the second prong of Perrier was that the defendant did not have "a legal right to be there." The trial court also asserted that it had not made a ruling regarding the aggravated burglary being unlawful conduct. The trial court held that it would charge the pattern jury instruction 40.06 but would omit any language stating that the Defendant did not have a duty to retreat.

Thereafter, the trial court provided the pattern jury instruction for self-defense in 40.06 but modified it to include the following "duty to retreat" language:

The defendant has a duty to retreat before using deadly force.

A "duty to retreat" means that she was obligated to employ all means in her power consistent with her own safety to avoid danger and avert the necessity of taking the alleged victim's life.

The Defendant asserts that because the trial court must view the evidence in the light most favorable to a defendant when determining whether a general defense such as self-defense has been raised by the proof, the court must do the same in determining whether a

defendant engaged in unlawful activity. See Benson, 600 S.W.3d at 903 ("When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor."). The Defendant claims the trial court "effectively took the State's proof as true and discounted her testimony entirely," which supported a finding that the standard self-defense instruction, without the "duty to retreat" language, should have been provided to the jury. The Defendant claims her testimony establishes: (1) she went to the Keisers' residence to ask Brent Menaugh not to provide marijuana to her son, and (2) she was threatened and struck repeatedly by Brent Menaugh and the victim while she was still outside.

The Defendant acknowledges that the trial court found she was "not in a place where she had a legal right to be" because she was "instructed to leave by individuals who had an interest in that dwelling." However, she asserts that this finding by the trial court assumes the veracity of the State's witnesses and fails to view the proof in the light most favorable to the Defendant. The Defendant claims she was not asked to leave by residents of the home; instead, she was threatened and physically assaulted. Accordingly, the Defendant maintains that the trial court erred by applying the "wrong standard to the question." Finally, the Defendant argues that the trial court's instructional error requires reversal. See State v. Taylor, No. W2023-00115-CCA-R3-CD, 2024 WL 1697775, at *18 (Tenn. Crim. App. Apr. 19, 2024) (concluding that the self-defense instruction constituted a non-structural constitutional error because it "left the jury with the impression that, since the Defendant was acting unlawfully and was in a place he did not have a right to be, the Defendant did not have a right to self-defense"). She asserts that the trial court's self-defense instruction in her case constitutes a nonstructural constitutional error that requires reversal unless the State demonstrates that the error was harmless beyond a reasonable doubt, which she argues the State cannot do in her case. See id. at *16 (citing State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

We conclude that the trial court is not required to "view the evidence in the light most favorable to the defendant" when making the "unlawful activity" determination. We reiterate that the "light most favorable to the defendant" is the appropriate standard for reviewing evidence to determine whether the issue of self-defense has been fairly raised by the proof. Perrier, 536 S.W.3d at 403; Benson, 600 S.W.3d at 903; Hawkins, 406 S.W.3d at 129. On the other hand, Perrier made clear that the "unlawful activity" determination must be made utilizing the procedure in Tennessee Rule of Evidence 404(b), which requires that the proof of the other crime, wrong, or act to be clear and convincing but does not require the trial court to view the evidence in the light most favorable to the defendant. Perrier, 536 S.W.3d at 403 ("[T]he trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply[,]" and "[b]ecause the

- 21 -

allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties"); State v. Southern, No. E2024-00112-CCA-R3-CD, 2025 WL 338066, at *10 (Tenn. Crim. App. Jan. 29, 2025) (observing that while "Rule 404(b) requires that proof of the other crime, wrong, or act to be clear and convincing, Rule 404(b) does not require that the trial court view the evidence in the light most favorable to Defendant" when making the "unlawful activity" determination), perm. app. denied (Tenn. May 28, 2025).

At trial, the Defendant admitted that she gained access to the Keisers' property by fraudulently posing as her son's cousin to set up a drug purchase from Brent Menaugh. The Defendant admitted that paramedics found marijuana from this drug transaction on her person when they provided medical treatment to her at the scene. She also admitted that she followed the victim to the house and pushed her hand, which held the gun, across the door's threshold at the time she shot the victim. During her police interview, the Defendant acknowledged that she "took the [marijuana]" from Brent but "didn't give him no [sic] money." She also conceded that she fired her gun while at the door to keep the victim from getting her gun, that she was trying to get inside the basement to "scare" the victim," and that she went after the victim, rather than going to her vehicle to leave, because the victim was "trying to get a gun." The surveillance video footage shows that the Defendant forced her way into the home and had crossed the door's threshold when she shot the victim. In addition, Barbara and Brent testified that although Brent and the victim told the Defendant to leave the property prior to the shooting incident, the Defendant refused to leave, thereby making her a trespasser. Ian also testified that the victim told the Defendant to leave the property. Barbara, Ian, and Desirae all testified that there was nothing preventing the Defendant from leaving the property. The surveillance video, as well as testimony from Ian and Joshua, show that the Defendant followed the fleeing victim to the basement, rather than returning to her truck and leaving the Keisers' property, which meant that although she had an opportunity to retreat, she failed to do so. At the conclusion of the trial, the jury found the Defendant guilty beyond a reasonable doubt of simple possession of marijuana and aggravated burglary. We conclude that the trial court properly determined that the Defendant had a duty to retreat because (1) she was engaged in unlawful activity, namely criminal trespass and a drug transaction, and (2) she was in a place she was not permitted to be, given that she was told to leave the premises and refused to do so. Either one of these findings, unlawful activity or being in a place one cannot legally be, is sufficient to prompt a defendant's duty to retreat. See Tenn. Code Ann. § 39-11-611(b); Perrier, 536 S.W.3d at 399. Considering the above proof, we conclude that the trial court properly found that the Defendant had a duty to retreat.

Even if there were an error in the trial court's declining to instruct the jury that the Defendant had no duty to retreat, which is unlikely, such an error would be harmless

beyond a reasonable doubt.  See Perrier, 536 S.W.3d at 404-05 (concluding that the trial court's error in instructing the jury on self-defense was "harmless beyond a reasonable doubt because no reasonable jury would have accepted the defendant's self-defense theory") (footnote omitted).  We reiterate that "'[i]n order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 404 n.8 (quoting State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013) (internal quotation marks and citations omitted)).

We also conclude that the trial court did not err when it modified the pattern jury instruction to affirmatively state that the Defendant had a duty to retreat before using deadly force.  This court has consistently approved language that affirmatively instructs a jury that a defendant, who was engaged in unlawful activity or was in a place he had no right to be, has a duty to retreat before acting in self-defense.  See State v. Murphy, 676 S.W.3d 91, 102-03 (Tenn. Crim. App. 2023) (approving the jury instruction stating that "the law of self-defense requires the defendant to have employed all means reasonably in his power, consistent with his own safety, to avoid danger and to avert the necessity of taking another's life" and that "[t]his requirement includes the duty to retreat in this case, if, and to the extent, it can be done in safety"); Taylor, 2024 WL 1697775, at *17 (recognizing that this court has upheld many special jury instructions referencing language similar to the common law duty to retreat); see also State v. Newson, No. M2021-00444-CCA-R3-CD, 2022 WL 2251303, at *10-11 (Tenn. Crim. App. June 23, 2022), perm. app. denied (Tenn. Nov. 16, 2022); State v. Foster, No. E2020-00304-CCA-R3-CD, 2021 WL 3087278, at *21-24 (Tenn. Crim. App. July 22, 2021), perm. app. denied (Tenn. Dec. 8, 2021); State v. Smith, No. W2018-01509-CCA-R3-CD, 2020 WL 3572071, at *16 (Tenn. Crim. App. June 30, 2020), perm. app. denied (Tenn. Dec. 3, 2020).  We reiterate that a trial court is not limited to pattern jury instructions.  See Murphy, 676 S.W.3d at 103; State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) ("Trial courts are not limited to the mere recitation of the pattern instructions."); State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001) (asserting that special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury.").  Therefore, we conclude that the trial court's jury instruction regarding the Defendant's duty to retreat was a correct statement of the law.

As a final note, we detect some clerical errors in the judgment forms that require correction.  While the judgment form for Count 1 notes that Count 1 is merged with Count 2, the judgment form for Count 2 states nothing about Count 1 merging with Count 2.  In a case such as this one, when two convictions merge, it is proper for the trial court to note the merger on both judgment forms.  See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order for publication summarily granting the application of the defendant under Rule 11

of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the 'Special Conditions' box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the 'Special Conditions' box on the uniform judgment document for the greater or surviving conviction."). Accordingly, we remand this case to the trial court for entry of corrected judgment forms in Count 1 and Count 2. On remand, the trial court should impose separate sentences for the convictions in Count 1 and Count 2; should place these sentences on separate, completed judgment forms; and should note in the "Special Conditions" box on each judgment form that Count 2 is the greater or surviving conviction following merger. See id.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed but the case is remanded for entry of corrected judgments in Count 1 and Count 2.


s/            Camille            R. McMullen
CAMILLE R. MCMULLEN, JUDGE